UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CARL PUIATTI,

                    Petitioner,

v.                                                      Case No. 8:92-CV-539-T-17EAK

SECRETARY, DEPT. OF CORRECTIONS,

                    Respondent.

_____

## ORDER

This cause is before the Court on Petitioner Puiatti's amended petition for a writ of

habeas corpus under 28 U.S.C. § 2254 (Dkt. 88). Puiatti, an inmate at Union Correctional

Institution, challenges his conviction and sentence to death for first degree murder, kidnapping,

and robbery, arising out of the Sixth Judicial Circuit, Pasco County, Florida, in case no. 83-1383.

After a careful review of the record, this Court finds that Puiatti's petition must be **granted** as to

the penalty phase of his trial, and **denied** as to the guilt phase of his trial.

### *PROCEDURAL HISTORY*

On August 16, 1983, Petitioner Carl Puiatti and his co-defendant, Robert Glock, were

charged by indictment with first degree murder, kidnapping, and robbery. Puiatti and Glock

were tried jointly by jury. The jury returned a verdict of guilty for both defendants. In a joint

penalty phase, the jury recommended death for each by a vote of 11-1. On May 16, 1984, the

state trial court judge sentenced Puiatti and Glock to death.

On direct appeal, the Florida Supreme Court affirmed Puiatti's conviction and sentence.

*Puiatti v. State*, 495 So.2d 128 (Fla. 1986). Puiatti filed a petition for writ of certiorari in the

United State Supreme Court. On April 27, 1987, the Supreme Court vacated the Florida Supreme Court's decision, and remanded to the Florida Supreme Court for reconsideration in light of *Cruz v. New York*, 481 U.S. 186 (1987). On rehearing, the Florida Supreme Court reaffirmed the state trial court's decision and sentence. *Puiatti v. State*, 521 So.2d 1106 (Fla. 1987). Puiatti applied for a writ of certiorari in the United States Supreme Court. The United States Supreme Court denied Puiatti's application. *Puiatti v. Florida*, 488 U.S. 871 (1988).

Puiatti then filed a Rule 3.850 motion, which was summarily denied by the state trial court. Puiatti appealed, and simultaneously filed a state petition for writ of habeas corpus in the Florida Supreme Court. In a consolidated opinion, the Florida Supreme Court affirmed the denial of the Rule 3.850 motion, and denied Puiatti's application for habeas corpus relief. *Puiatti v. Dugger*, 589 So.2d 231 (Fla. 1991).

Puiatti sought relief with this Court by filing a 28 U.S.C. § 2254 petition for writ of habeas corpus on April 23, 1992. Subsequently, this Court granted a stay and abey motion to allow Puiatti to exhaust remedies and pursue new claims in state court. Pursuant to the stay and abey motion, this Court administratively closed the case.

On January 30, 2003, Puiatti filed a Rule 3.851 motion to vacate sentence in state court, pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002) and *Atkins v. Virginia*, 536 U.S. 304 (2002), alleging that he was mentally retarded. The state trial court denied Puiatti's motion on May 30, 2003. Puiatti appealed, and on November 12, 2004, the Florida Supreme Court issued an order treating the appeal as a motion to relinquish jurisdiction to the state trial court on the issue of mental retardation. *See.* Fla. R. Crim. Pro. 3.203. The Florida Supreme Court granted the motion

2

to relinquish jurisdiction, and relinquished jurisdiction to the state trial court on the issue of mental retardation.

While the question of mental retardation was pending in the state trial court, Puiatti withdrew his claim of mental retardation. After reviewing expert reports and considering Puiatti's withdrawal of his claim, the state trial court issued an order on April 18, 2005, ruling that Puiatti was not mentally retarded. On June 8, 2005, this Court entered its order on the issue of mental retardation, ruling that Puiatti was not entitled to relief under *Ring* and *Atkins*.

On July 19, 2005, Puiatti filed another Rule 3.851 motion to vacate sentence in the state trial court, claiming that new law required the state trial court to consider the motion. The state trial court disagreed, and denied Puiatti's motion on September 7, 2005. The Florida Supreme Court affirmed the denial of relief. *Puiatti v. State*, 939 So.2d 1060 (Fla. 2006).

On May 15, 2008, this Court reopened the case, dismissing the original petition without prejudice to Puiatti's filing an amended petition. On November 24, 2008, Puiatti filed an amended petition for a writ of habeas corpus and a memorandum of law in support (filed November 21, 2008). The response was filed on April 17, 2009. Puiatti filed a reply on July 15, 2009.

### *STATEMENT OF FACTS*

The Florida Supreme Court set out the facts in *Puiatti v. State*, 495 So.2d 128 (Fla. 1986). In essence, the Florida Supreme Court stated:

The trial record reflects that on August 16, 1983, the female victim, Mrs. Sharilyn Ritchie, arrived at a Bradenton shopping mall. As she exited her automobile, Puiatti and Glock

3

confronted her, forced her back inside the car, and drove away with her. They took $50 from her purse and coerced her into cashing a $100 check at her bank. They drove the victim to an orange grove outside Dade City in Pasco County, where they took Mrs. Ritchie's wedding ring and abandoned her in the orange grove. After driving a short distance, Puiatti and Glock determined that Mrs. Ritchie should be killed, and they returned. Puiatti then shot her twice. Puiatti and Glock drove away, but, when they saw she was still standing, they drove by Mrs. Ritchie again and Glock shot her. When she did not fall, Puiatti and Glock made a third pass with the automobile; Glock shot her another time, and Mrs. Ritchie collapsed.

Four days later, a New Jersey state trooper stopped Puiatti and Glock in Mrs. Ritchie's vehicle in New Jersey, because the license plate was improperly displayed. When neither Puiatti nor Glock could present a valid driver's license, the officer requested the car's registration. Puiatti opened the glove box, and the trooper saw a handgun. The officer seized that handgun, searched the vehicle, and uncovered another handgun. He then arrested both men for possession of handguns without permits. The police later identified the handgun from the glove box as the murder weapon.

The next day Puiatti and Glock individually confessed to the kidnapping, robbery, and killing. These initial confessions varied only to the extent that each blamed the other as being the instigator of the murder and each offered a different sequence as to who fired the shots at the victim. Both Puiatti and Glock admitted he shot the victim. Three days later, on August 24, 1983, Puiatti and Glock made a joint statement in which they resolved the inconsistencies in their prior individual statements: they agreed that Glock initially suggested shooting the victim; that Puiatti fired the first shots; and that Glock fired the final shots.

Before trial, both Puiatti and Glock moved to sever their trials on the ground that the State intended to introduce each defendant's individual confession. The state trial court denied the motions. At trial, neither Puiatti nor Glock testified on his own behalf, and the three confessions - the two individual confessions and the joint confession - were admitted into evidence. Each defendant objected only to the introduction of the individual confessions. The state trial court overruled Puiatti's and Glock's objections, but, before admitting each individual statement, the state trial court instructed the jury to disregard each defendant's individual confession to the extent that it tended to implicate the other defendant.

The jury found each defendant guilty of first-degree murder, kidnapping, and robbery. In the joint penalty phase, Puiatti did not rely on the mitigating factor of no significant prior criminal history, but offered psychiatric testimony to support the assertion that he was under Glock's substantial domination at the time of the crimes. Glock argued that his lack of significant prior criminal history and psychiatric evidence suggesting that he would not have participated in the crime but for his association with Puiatti constituted mitigating factors. The jury, by an 11-to-1 vote, recommended the death penalty for both Puiatti and Glock.

The state trial court judge, after weighing the aggravating and mitigating circumstances, sentenced Puiatti and Glock to death. The state trial court judge found no mitigating circumstances and that the state had proven three aggravating factors: (1) the murder was committed to avoid arrest [section 921.141(5)(e), Florida Statutes (1983) ]; (2) the murder was committed for pecuniary gain [section 921.141(5)(f), Florida Statutes (1983) ]; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification [section 921.141(5)(i), Florida Statutes (1983) ].

5

## THE PETITION

The instant petition presents the following grounds for relief:

**Ground One:** The trial court's refusal to sever Puiatti's penalty phase from that of his co-defendant deprived him of an individualized sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**Ground Two:** Puiatti was denied the effective assistance of counsel during the guilt phase of his trial in violation of the Sixth, Eighth and Fourteenth Amendments.

**Ground Three:** Puiatti was denied effective assistance of counsel during the penalty phase of his trial in violation of the Sixth, Eighth and Fourteenth Amendments.

**Ground Four:** Puiatti was denied effective assistance of counsel on direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments.

**Ground Five:** Puiatti's Eighth Amendment rights were violated by the trial court's refusal to find mitigating circumstances clearly set out in the record.

**Ground Six:** The trial court's refusal to provide Puiatti's sentencing jury with instructions explaining the aggravating circumstances submitted to it violated Puiatti's Eighth and Fourteenth Amendment rights and rendered his death sentence invalid.

**Ground Seven:** The prosecutor's inflammatory arguments during the guilt and penalty phases of the trial rendered the proceedings fundamentally unfair and unreliable in violation of the Eighth and Fourteenth Amendments.

**Ground Eight:** The admission of Glock's confession violated *Bruton v. United States*, 391 U.S. 123 (1968), and deprived Puiatti of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

## *STANDARD OF REVIEW*

A petition for a writ of habeas corpus will issue only if the state court proceedings were flawed to the extent that they violated federal law: "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241). Since this Petition was filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this case is governed by pre-AEDPA law. Generally, pre-AEDPA review of state court proceedings is less deferential than review under AEDPA.

### A. *Evidentiary Hearings*

In contrast to AEDPA, which requires an evidentiary hearing only if the relevant state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), pre-AEDPA law dictates that "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend v. Sain*, 372 U.S. 293, 312-313 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992).

Specifically, *Townsend* dictates that a court must grant an evidentiary hearing under any of the following circumstances:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313.

### B. Procedural Default

For a federal court to review a claim in a habeas petition, a petitioner "must have presented his claims in state court in a procedurally correct manner." *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995). "A state court's denial of a claim based on a procedural violation generally bars a federal court from considering the claim." *Id.* In addition, state courts must have been given a fair opportunity to adjudicate the claims in a petition before they are brought in federal court. *Picard v. Connor*, 404 U.S. 270, 275 (1971) (holding that claims not "fairly presented" in state court are unexhausted and will not be entertained in federal court).

If a claim is procedurally defaulted, this Court only will entertain the claim if a petitioner can show either (1) cause for default and actual prejudice, or (2) a fundamental miscarriage of justice resulting in the conviction of an "actually innocent" defendant. See *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Murray v. Carrier*, 477 U.S. 478 (1986).

### C. Actual Prejudice

Finally, a habeas petition will only be granted if the Constitutional violation at the trial level resulted in "actual prejudice" to the petitioner. *Brecht v. Abramson*, 507 U.S. 619, 637 (1993) (holding that simply establishing error in state court proceedings is not sufficient for a writ of habeas corpus to issue). The alleged error must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637-638.

## *PENALTY PHASE*

### Ground One: Failure to Sever Penalty Phase

*A. Procedural Default*

Respondent urges that Ground One of the Petition is procedurally barred because it was not raised on direct appeal. However, a review of the state record shows that this is not the case. On direct appeal, Puiatti alleged that "[t]he trial court abused its discretion by denying Puiatti's motion to sever his trial from that of his co-defendant." While this allegation does not specifically implicate the penalty phase of Puiatti's trial as it relates to the Eighth Amendment, the claim objects to the failure to sever the entire trial, including the penalty phase. The Florida Supreme Court spoke directly to the issue of severance of the penalty phase of the trial in its opinion: "he [Puiatti] claims that the trial court's denial of a severance in the penalty phase prejudiced him." *Puiatti v. State*, 495 So.2d 128, 131 (1986). Since the claim was fairly presented to the Florida Supreme Court on direct appeal and adjudicated on its merits, Ground One is not procedurally defaulted.

9

*B. Evidentiary Hearing*

No evidentiary hearing is required as to Ground One, as the claim only requires the Court to determine whether, as a matter of law, Puiatti had a Constitutional right to an individualized sentence, and whether that right was violated. All evidence required to make that determination is in the record.

*C. Constitutional Violation*

Puiatti argues that the Eighth Amendment guarantees a right to individualized sentencing in a capital case. Puiatti mainly relies on *Lockett v. Ohio*, 438 U.S. 586 (1978), which invalidated an Ohio statute for Eighth and Fourteenth Amendment violations, stressing that "the Eighth and Fourteenth Amendments require that the sentencer be given a full opportunity to consider mitigating circumstances in capital cases." *Lockett*, 438 U.S. at 602. Puiatti also points to several recent cases in which courts have severed sentencings to protect a co-defendant from prejudice. *See United States v. Henderson* 442 F.Supp.2d 159, 160, 162-163 (S.D.N.Y. 2006) (severing the penalty phase of a capital case, and instead ordering sequential sentencing proceedings, to avoid potential prejudice resulting from the comparison of co-defendants' mitigating evidence); *United States v. Catalan-Roman*, 376 F.Supp.2d 96, 106-107 (D.P.R. 2005) (severing the penalty phase of a capital case due to a disparity between the strength of two co-defendants' mitigating evidence). In *Catalan-Roman*, the court found unconstitutional the possibility that "[t]he jury could possibly balance one defendant against the other and decide which of the two was worse and deserved the harshest penalty." *Catalan-Roman*, 376 F.Supp.2d at 107. Puiatti asserts that the penalty phase of his trial deprived him of the opportunity to

effectively present mitigating evidence to the jury, and therefore compromised the individual sentencing determination guaranteed by the Eighth and Fourteenth Amendments.

In response, Respondent argues that joint trials are an essential part of the criminal justice system. Citing *Richardson v. Marsh*, 481 U.S. 200 (1987), Respondent contends that "[j]oint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." *Id.* at 209-210. Respondent also cites several cases upholding decisions not to sever joint trials. In *Zafiro v. United States*, 506 U.S. 534 (1993), the Supreme Court held that a trial court is not required to sever the trials of co-defendants who present mutually antagonistic defenses. Likewise, the Eleventh Circuit has held that a joint trial is inappropriate only if it "(1) would compromise a specific trial right of one of the defendants, or (2) would prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Browne*, 505 F.3d 1229, 1268-1269 (11th Cir. 2007) (citations omitted). Respondent asserts that since Puiatti and Glock "participated as a team in the kidnap-murder of Sharon [sic] Ritchie, it is not unreasonable for a jury to also consider their culpability and penalties together." Response to Petition at 22. Respondent compares a joint penalty phase to a situation in which a capital defendant seeks to mitigate his own sentence by asking a jury to consider the sentence imposed on an accomplice or a co-defendant.

Respondent's points may be valid with respect to joint <u>guilt phases</u>; however, Puiatti complains of Constitutional violations arising out of a joint <u>penalty phase</u>. Puiatti's argument is not that he and Glock presented "antagonistic defenses," but rather that Glock's involvement in Puiatti's penalty phase substantially impaired Puiatti's ability to present mitigating evidence, as guaranteed by *Lockett*. Respondent is correct that a capital defendant can ask a jury to consider his co-defendant's sentence, hoping to receive a similar or lesser sentence, but the capital

11

defendant's doing so is fundamentally different from the alleged violation in this case. Puiatti alleges not only that the jury compared Puiatti to Glock in determining their respective sentences, but also that the sentencing process fundamentally compromised the jury's ability to differentiate one defendant from the other, and deprived Puiatti of individualized consideration in sentencing. Even under the precedent set forth in *Browne*, a joint penalty phase was inappropriate, because it compromised one of Puiatti's Constitutional rights at trial: the right to an individualized determination of sentence in a capital case.

This Court need not decide whether the Eighth and Fourteenth Amendments guarantee the right to a separate penalty phase in <u>any</u> capital case involving co-defendants. *Lockett* and its progeny, as applied to the facts of this case, indicate that Puiatti had a Constitutional right to a severed penalty phase.[1] *Lockett* makes it clear that a defendant has the right to the sentencers' full and unencumbered consideration of mitigating factors, and any interference with that right is a Constitutional violation. While this Court frowns upon undue severance, Puiatti has sufficiently implicated a Constitutional violation because he had a Constitutional right to individual determination of sentence. The question then becomes whether that violation resulted in actual prejudice to Puiatti.

### D. Actual Prejudice

Even if Puiatti sufficiently alleges a Constitutional violation, a writ of habeas corpus will not issue unless the Constitutional violation resulted in actual prejudice at the trial level. Puiatti points to the structure of the penalty phase, alleging the jury was not given the opportunity to

---

[1] Respondent argues this Court must reject Puiatti's assertion of an Eighth Amendment violation because it rejected Glock's habeas petition. *Glock v. Dugger*, 752 F.Supp. 1027 (M.D. Fla. 1990). However, the sentencing proceedings affected each co-defendant differently, and resulted in varying levels of prejudice. Further, this Court did not reach the issue of an Eighth Amendment violation in the *Glock* decision, because it was not raised in Glock's habeas petition.

consider Puiatti's individual mitigating factors. Respondent argues that Puiatti has not shown actual prejudice, and that any Constitutional violation in Puiatti's penalty phase does not rise to the level required for a writ of habeas corpus to issue.

### i. Opening Arguments and Witnesses

There is ample evidence in the record to suggest that Puiatti's penalty phase was significantly different from what it would have been had Puiatti's motion to sever been granted. At the beginning of the penalty phase, the state trial court asked counsel whether they wanted to make opening statements. Puiatti's attorney told the court that she had an opening statement prepared and would like the opportunity to give the statement, while the State indicated it was prepared but had no preference on the issue. Glock's attorney, however, urged the court not to allow an opening statement from any party. The state trial court declined to allow opening statements, which it likely would have allowed had Puiatti been sentenced in a severed penalty phase.[2] R. 2216-2217. While not rising to the level of actual prejudice to Puiatti, this decision not to allow opening statements was the first of many ways in which Puiatti's joint penalty phase differed from an individual penalty phase.

Puiatti alleges prejudice stemming from the fact that the jury listened to two sets of mitigation witnesses during the penalty phase. The order of witnesses during the penalty phase was as follows: (1) witnesses for the State; (2) Puiatti's expert witness; (3) Glock's witnesses, including an expert witness; and (4) the remainder of Puiatti's witnesses. Each witness was cross-examined by the two other parties. Puiatti argues that the order of witnesses and Glock's

---

[2] Puiatti also argues that prejudice is evident from the fact that Puiatti's family members were not allowed to remain in the courtroom during the penalty phase as a result of Glock's objections to their doing so. Glock urged the state trial court judge to exercise his discretion and not allow Puiatti's non-testifying family members to remain in the courtroom during the penalty phase. R. 2221. While this is a factor that distinguished Puiatti's penalty phase from a typical penalty phase, it does not inform any prejudice.

13

cross-examination of Puiatti's witnesses prejudiced the jury to the point that the its recommendation as to Puiatti's sentence was not determined as to Puiatti as an individual. Respondent counters that the record reflects that Puiatti did not object to the order of witnesses, and was in fact happy to allow his expert witness to testify out of order.[3] Further, Respondent argues that the State asked the majority of questions on cross-examination, and that Glock's cross-examination of Puiatti's witnesses had a minimal impact on the proceeding.

That Puiatti did not object to the order of witnesses during the penalty phase does not preclude him from claiming now that the order of witnesses prejudiced the jury. Puiatti called his expert witness, Dr. Donald Delbeato, to support the assertion that Puiatti "acted under extreme duress or under the substantial domination of another person," a mitigating factor under Florida law. *See* Fla. Stat. § 921.141(6)(e). Dr. Delbeato testified that Puiatti was easily influenced, and likely would not have committed the offenses but for Glock's influence. In a severed penalty phase, Dr. Delbeato would have been cross-examined only by the State. However, Dr. Delbeato was cross-examined not only by the State, but also by Glock's counsel. Further, Glock called his own expert witness to attest that Glock was the more easily influenced of the two co-defendants, in direct contradiction to the testimony of Puiatti's witnesses.[4] Even disregarding the order in which the witnesses testified, Puiatti's ability to present mitigating evidence was substantially diminished by the joint proceeding. Respondent correctly states that courts have allowed defendants to be tried together even when they present contradictory defenses, but a joint trial does not implicate the Eighth Amendment as a joint capital penalty phase does. Even if Puiatti's witnesses had been cross-examined only by the State at the joint

---

[3] The state trial court record is unclear as to the reasoning behind Puiatti's expert witness's testifying out of order.
[4] Respondent asserts that the testimony of Glock's expert, Dr. Gerald Mussenden, was cured by Puiatti's ability to cross-examine Dr. Mussenden. However, even if Puiatti's counsel effectively discredited Dr. Mussenden's testimony, Puiatti's expert witness would not gain any credibility he had lost as a result of Glock's cross-examination.

penalty phase of the trial, the proceeding would have implicated Puiatti's Constitutional rights, as the Constitution does not permit a penalty phase in which two co-defendants attempt to present mutually exclusive mitigating factors. *See, e.g., Lockett,* 438 U.S. 586. By its very nature, such a joint penalty phase impedes a jury's ability to individually consider each defendant, as demanded by the Eighth and Fourteenth Amendments.

### ii. Puiatti's Failure to Testify

Puiatti also complains that Glock testified on his own behalf, while Puiatti could not testify because he would have been impeached with two prior convictions that were otherwise inadmissible due to his waiver of the "prior criminal activity" mitigating factor. *See* Fla. Stat. § 921.141(6)(a). Glock's testimony, Puiatti alleges, further contributed to the jury's view that the penalty phase was a "competition between defendants over who has more or stronger mitigation or who is a better or more forthcoming person." Amended Petition at 14. Puiatti claims that "the denial of severance . . . clearly penalized Puiatti for exercising his right not to testify." *Id.*

Respondent counters that Glock's testimony was insignificant, as shown by the fact that Puiatti's counsel opted not to cross-examine Glock. Further, Respondent asserts that Puiatti voluntarily chose not to assert the "prior criminal activity" mitigating factor, and cannot now complain that he did not have the opportunity to testify.

Respondent is correct in pointing out that Puiatti chose not to testify on his own behalf. Puiatti could not reap the benefits of testifying without facing impeachment with prior convictions on cross-examination. However, Puiatti's choosing not to testify on his own behalf would not have been significant to the jury but for Glock's testifying. A defendant has the right not to testify in a penalty phase, and any suggestion to the jury that the exercise of that right is

15

somehow significant is violative of the Constitution. *Griffin v. California*, 380 U.S. 609, 614-615 (1965) (holding that while a jury may, as a practical matter, infer guilt on its own from a defendant's failure to testify, but that comment on that failure to testify violates the Constitution); *Carter v. Kentucky*, 450 U.S. 288 (1981) (holding that if a defendant requests it, a trial judge must instruct a jury that no adverse inference can be drawn from a defendant's failure to testify). But for the joint penalty phase, Puiatti's jury would not have been able to compare Glock's testifying to Puiatti's silence. The Fifth Amendment does not allow a joint penalty phase where the testimony of one defendant highlights to the jury the other defendant's failure to testify. *See Griffin*, 380 U.S. 609; *Carter*, 450 U.S. 288.

### iii. Prosecutor's Closing and Jury Instructions

Puiatti alleges that the prosecutor in the penalty phase took advantage of the joint proceeding to further de-individualize Puiatti, as the prosecutor had done during the guilt phase of Puiatti's trial. Puiatti complains that the prosecutor called Puiatti and Glock "as alike as two peas in a pod." R. 2482. Further, the prosecutor described the co-defendants as having a "symbiotic relationship," arguing that neither would have committed the crime without the other. R. 2483. Respondent contends that there was nothing improper about the prosecutor's closing argument, as shown by the lack of objection from Puiatti's counsel, and that the prosecutor was simply urging that <u>both</u> defendants deserved the death penalty.

While Respondent is correct that under the circumstances, the prosecutor's closing argument was not improper, the prosecutor was only able to make such an argument because the penalty phase was joint. Had Puiatti's penalty phase been severed from Glock's, the prosecutor would have been forced to argue directly against Puiatti's mitigating circumstances, rather than

to group the co-defendants together, further de-individualizing Puiatti. Of most concern is the prosecutor's "symbiotic relationship" argument; Puiatti and Glock were already battling to convince the jury that each of them was under the influence of the other, and the prosecutor used that battle to suggest that they were equally culpable, and deserved the same punishment. The prosecutor cannot be faulted for his closing argument, but it compounded the lack of individualization already present in the case.

Puiatti also alleges that prejudice is evident from the actions and words of the state trial court during sentencing, and the subsequent treatment of the case on direct and collateral appeal. Puiatti points to a portion of the jury instructions in which the state trial court judge instructed the jury: "it is now your duty to advise the court as to what punishment should be imposed upon Glock and Puiatti." R. 2521. Puiatti asserts that the phrasing of the jury instructions suggest that the jury should impose a single punishment on Puiatti and Glock, rather than determine their sentences individually. Respondent counters that the jury instructions taken as a whole clearly individualize the defendants:

> Now, if a majority of the jury determine that Robert Glock, II, should be sentenced to death, your advisory sentence will be a majority of the jury, by a vote of -- and a number of whatever number voted so voted advise and recommend to the Court that it impose the death penalty upon Robert D. Glock, II.
>
> If a majority of the jury determine that Carl Puiatti should be sentenced to death, your advisory sentence will be a majority of the jury, by a vote of -- and indicated whatever that vote is, advise and recommend to the Court that it impose the death penalty upon Carl Puiatti.
>
> On the other hand, if by six or more votes, the jury determines that Robert D. Glock, II, should not be sentenced to death, your advisory sentence will be the jury advises and recommends to the Court that it impose a sentence of life imprisonment upon Robert D. Glock, II, without possibility of parole for twenty-five years.
>
> And if by six or more votes the jury determines that Carl Puiatti should not be sentenced to death, your advisory sentence will be the jury advises and recommends to the Court

that it impose a sentence of life imprisonment upon Carl Puiatti without possibility of
parole for twenty-five years.

R. 2525-2527. While the jury instructions were not prejudicial to Puiatti, it is disconcerting that

the court's sentencing order tended to refer to Puiatti and Glock as a pair, rather than as

individuals: "They were both about the same age and the same intelligence. They both had the

same education. They were both raised in middle class surroundings." Findings in Support of

Sentences at 5.

*iv. Appellate Review*

Puiatti also points to the Florida Supreme Court's treatment of Puiatti and Glock as

evidence that the joint penalty phase created the impression that the co-defendants were a

singular unit. Puiatti argues that the Florida Supreme Court's consolidation of the cases and

issuance of a joint opinion further contributed to Puiatti's denial of individualized consideration

in violation of the Constitution. Further, Puiatti points out that the state trial court, when

subsequently reviewing Puiatti's Rule 3.850 motion, incorrectly referenced Puiatti's testifying

"on his on [sic] behalf" during the penalty phase, when it was actually Glock who spoke on his

own behalf.

Respondent argues that the Florida Supreme Court's treatment of the Puiatti and Glock

cases was not a deprivation of individual consideration, but rather a matter of convenience.

Respondent points out that the Florida Supreme Court held separate oral arguments for the

Puiatti and Glock cases, albeit on the same day, and devoted separate sections of their opinion to

each defendant. Respondent also asserts that the state trial court may have made a typographical

error when it referred to Puiatti's testifying on his own behalf: "It is not clear whether the Court

intended to say Mr. Puiatti (Puiatti's father) spoke on his son's behalf or whether it intended to say that Puiatti testified on his own behalf." Response to Petition at 32.

While the treatment of Puiatti and Glock as a pair by a sentencing <u>jury</u> is potentially violative of the Constitution, consolidation of their cases by the Florida Supreme Court is of less concern. The Florida Supreme Court heard separate arguments from the defendants, and conducted separate analyses in the joint opinion. Unlike the jury at the penalty phase, whose reasoning process is uncertain, it is clear that the Florida Supreme Court separated the two defendants for the purpose of appellate review, and afforded each a fair hearing. Although the Florida Supreme Court afforded Puiatti a fair hearing, its doing so did not cure the defects in Puiatti's penalty phase.

The state trial court, on the other hand, genuinely confused the co-defendants in its opinion. It is specious to suggest that the court made a typographical error, and intended to reference Puiatti's father; if Puiatti's father were speaking, it would not have been on his <u>own</u> behalf. The state trial court clearly confused Glock's testimony with Puiatti's. This confusion speaks directly to the nature of the joint penalty phase, and the risk that the joint penalty phase de-individualized each defendant in the eyes of the jury. While the state trial court's confusion is not dispositive, it is indicative of the larger violation Puiatti alleges.

*v. Conclusion*

Puiatti presents ample evidence to suggest that the Constitutional violation at Puiatti's joint penalty phase was sufficient to actually prejudice him.[5] The thought process of a

---

[5] It is worth noting that Puiatti presents statistical evidence that suggests jurors are more likely to vote for death in joint sentencing hearings. A 1994 study reported that prospective jurors "voted for death 65.1% of the time" in a sentencing with three defendants, but "just 47.2% of the time when the defendant was tried alone." Edward J.

sentencing jury is unknown to all but the twelve deciding jurors; however, Puiatti has proven that the structure of the penalty phase created a substantial risk that the jury was unable to individualize Puiatti in reaching a sentencing recommendation. A defendant in a capital case must be afforded the full opportunity to present mitigating evidence. The Puiatti and Glock joint penalty phase severely impaired Puiatti's ability to present such evidence. Many of his mitigating witnesses were directly contradicted by Glock's witnesses; each of his mitigating witnesses was subject to double cross-examination; Glock's testimony highlighted Puiatti's failure to testify; and the prosecutor used the joint nature of the proceedings to further de-individualize the defendants. Together, these circumstances effected a crippling blow to Puiatti's individual identity in the eyes of the judge and jury, and violated his rights under the Eighth and Fourteenth Amendments.

## Grounds Three, Five, Six, and Seven

Puiatti argues that there were other Constitutional deficiencies in the penalty phase of his trial. Grounds Three, Five, Six, and the portion of Ground Seven challenging the prosecutor's improper closing argument at the joint penalty phase are subsumed by Ground One because the Court has determined that Puiatti's Constitutional rights were violated during the joint penalty phase of his trial. Therefore, Grounds Three, Five, Six, and the portion of Ground Seven challenging the prosecutor's improper closing argument at the joint penalty phase are moot.

---

Bronson, *Severance of Co-Defendants in Capital Cases: Some Empirical Evidence*, Cal. St. U., Chico, Discussion Paper Series No. 94-1 (1994).

## GUILT PHASE

### Ground Two: Ineffective Assistance of Trial Counsel

Puiatti argues that he was denied effective assistance of counsel during the guilt phase of his trial. The basic test for ineffective assistance of counsel requires a petitioner to show (1) deficient performance by counsel, and (2) prejudice resulting from that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance is performance that falls "below an objective standard of reasonableness." *Id.* In applying the first prong of the *Strickland* test, a court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. The purpose of the *Strickland* analysis is not to grade attorney performance, or compare counsel's strategies to those of other lawyers: "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Prejudice is established only when a petitioner shows that his trial was unfair or unreliable as a result of counsel's deficient performance, and that the outcome of his trial would have been different had counsel performed as a petitioner urges counsel should have performed. *Lockhart v. Fretwell*, 506 U.S. 364 (1993). Merely showing that the result of a trial was affected by counsel's performance does not satisfy the prejudice prong of the *Strickland* test. *Id.*

#### A. The Suppression Hearing

Puiatti argues that he was denied effective assistance of counsel at his suppression hearing because Puiatti's counsel, William Eble, failed to prepare adequately for the suppression hearing, as shown by his failure to argue Puiatti's alleged (1) organic brain damage; (2) borderline retarded I.Q.; (3) emotionally stunted development and personality traits; and (4)

inability to understand his *Miranda* rights.[6] Puiatti alleges that because Eble had a "tremendous caseload" at the time he represented Puiatti, he failed to adequately research legal reasons to suppress Puiatti's confessions. Puiatti also argues that Eble failed to discover and argue key facts relating to the voluntariness of Puiatti's confession. Specifically, Puiatti alleges Eble should have discovered that Puiatti was held for five days in isolation from everyone except police officers; was not allowed access to an attorney during his first five days in custody; was not arraigned until he had been in custody for nearly two days; and had been awake for more than 20 hours when he gave his joint confession with Glock.

### i. Psychological Defenses

The record shows that Eble could not have raised successfully any psychological defenses at the suppression hearing to show that Puiatti's confessions were involuntary. Testimony from psychologists during the guilt phase of the trial showed that Puiatti was not mentally retarded, and, despite his having a below average I.Q., was capable of understanding his *Miranda* rights.[7]

Several factors for evaluating psychological defenses to the voluntariness of a confession are laid out in *Henyard v. McDonough*, 459 F.3d 1217, 1241 (11th Cir. 2006), in which the court affirmed the rejection of the involuntary confession claim of an eighteen-year-old defendant:

> The totality of the circumstances indicate that (1) the police explained Henyard's rights to him twice; (2) Henyard's intelligence, although below average, was not so low that he could not understand his rights; (3) the transcript of the interrogation and Henyard's responses to the police give no indication that he was confused or that he misunderstood the seriousness of the interrogation; (4) the police did not engage in any trickery,

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966)
[7] In fact, Puiatti testified during the suppression hearing that he was repeatedly advised of his rights, and that he understood them.

deception, or improper interrogation tactics; and (5) Henyard had previous experience with the justice system.

Applying the *Henyard* factors to Puiatti's case, it is unlikely that the state trial court would have found Puiatti's confession to be involuntary based on Puiatti's ability to understand his rights. Further, even assuming that Eble could have successfully raised a psychological defense, his doing so would not have been sufficient for the state trial to suppress Puiatti's confession without additional evidence of police misconduct. *See Colorado v. Connelly*, 479 U.S. 157 (1986) (holding that police misconduct causally related to a confession is required to implicate a due process violation).

### ii. Custodial Treatment

Puiatti also alleges that Eble was ineffective because he failed to make arguments related to the treatment of Puiatti while he was in custody. However, the record shows that Eble made many such arguments. Eble argued that Puiatti was not allowed to make a phone call to his uncle when Puiatti requested to do so. Suppression Hearing Transcript 46:4-14. Eble argued that Puiatti was not promptly taken before a judge upon Puiatti's arrest. *Id.* 46:15-48:6. Eble argued that Puiatti was not allowed to speak to a lawyer for several days after Puiatti's arrest. *Id.* 49:20-50:7. Eble argued that Puiatti was denied contact with everyone except police officers for several days during his detention. *Id.* 52:10-15. Puiatti's allegation that Eble did not effectively raise claims of improper detention during the suppression hearing are unfounded.

While Puiatti's co-counsel states that if she and Eble were to re-try this case, they would proceed differently[8], the benefit of hindsight will almost always reveal what seem to be better and stronger defense strategies. To fairly assess effectiveness of counsel, every effort must be

---

[8] Puiatti quotes Puiatti's co-counsel, Ms. Howardene Garrett: "If I were to try this case over again today I would approach it entirely differently." Garrett Aff. ¶ 11, App. 1.

made to eliminate the distorting effects of hindsight. *Strickland*, 466 U.S. at 696. Puiatti's counsel effectively disputed the voluntariness of Puiatti's confession on the grounds that he was improperly detained, and perhaps coerced to confess. As to Puiatti's claim that Eble should have raised psychological defenses during the suppression hearing, the record shows the defenses would not have been successful. Puiatti has not shown that Eble's actions during the suppression hearing amounted to ineffective assistance of counsel.[9]

## B. The Probative Value of Puiatti's Confessions

Puiatti claims that he was denied effective assistance of counsel during the guilt phase of his trial because his counsel failed to contest the probative value of Puiatti's confessions. Puiatti asserts that Eble should have presented evidence to show that Puiatti's "personality disorder made him readily susceptible to suggestion and pressure" from police officers. Amended Petition at 25. Puiatti also argues that Eble did not know that testimony from mental health experts could be used during the guilt phase of Puiatti's trial, but rather thought it was only admissible during the penalty phase.

The defense that one has a dependent personality is not available in Florida. Any attempt to introduce evidence regarding Puiatti's alleged dependent personality disorder would have been denied by the trial court. *See* Order Denying Motion for Post-Conviction Relief at 10 (Apr. 27, 1990). Further, even if Puiatti could have successfully introduced evidence of his having a dependent personality to cast doubt upon the probative value of his confessions, the tactic would

---

[9] In addition to the motion to suppress Puiatti's confession, Eble and Garrett filed many of the motions and requests one would expect to be filed prior to the beginning of a capital trial: several motions to dismiss; motions for the appointment of psychiatrists, psychologists, and forensics experts; a request for a statement of aggravating circumstances; a motion for production of favorable evidence; a motion for disclosure of search and seizure; a motion for the appointment of a mental health expert; a motion to empanel a separate jury for the penalty phase of the trial; a motion to sever Puiatti's trial from Glock's; and a motion to increase the number of peremptory challenges.

have failed. The prosecution relied on a substantial amount of additional inculpatory evidence to convict Puiatti. For example, Puiatti and Glock were arrested in Sharilyn Ritchie's stolen car, and the murder weapon was found in the car. Puiatti has failed to show sufficient prejudice as required by *Strickland* resulting from the alleged ineffective assistance of counsel for counsel's failure to contest the probative value of Puiatti's confessions.

### C. *Mens Rea as to Premeditated Murder*

Puiatti argues he was denied effective assistance of counsel when Eble failed to argue that Puiatti lacked the requisite *mens rea* required for premeditated murder. Puiatti argues that he did not have the requisite *mens rea* because he "snapped" and because he acted on an irresistible impulse at the time of the murder. Although Eble argued that Puiatti "snapped," Puiatti alleges that counsel failed to introduce evidence to support that defense. Puiatti claims that Eble did not present supporting evidence because he was not familiar with Puiatti's case, and with the expert witnesses involved. Puiatti asserts that Dr. Delbeato would have testified during the guilt phase that Puiatti was "acting under an irresistible impulse" with an "inability to control his behavior" at the time the murder was committed. Delbeato Aff. ¶ 4, App. 29. Puiatti compares his case to *Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987), in which a defendant succeeded on an ineffective assistance of counsel claim after his counsel failed to argue incapacity to form specific intent.

Had Dr. Delbeato testified that Puiatti was "acting under an irresistible impulse" during the guilt phase of Puiatti's trial, his testimony would not have affected the outcome of the guilt phase of Puiatti's trial because the "irresistible impulse" defense is not a recognized criminal defense in Florida. *Van Eaton v. State*, 205 So.2d 298 (Fla. 1967) ("The irresistible impulse rule .

25

. . has never been followed in this jurisdiction.") Similarly, testimony that Puiatti had an "inability to control his behavior" at the time of the murder, which would have supported a diminished capacity defense, would not have affected the outcome of the guilt phase of Puiatti's trial, as it is well-established in Florida that diminished capacity is not a criminal defense. *Chestnut v. State*, 538 So.2d 820 (Fla. 1989) (holding that diminished capacity is not a viable defense). Counsel's failing to raise non-viable Florida criminal defenses does not constitute ineffective assistance of counsel. *See Evans v. State*, 946 So.2d 1 (Fla. 2006) ("Counsel cannot be ineffective for failing to seek to introduce evidence of a meritless defense at the guilt phase") (citations omitted).

Further, Puiatti's assertion that *Magill* dictates that Puiatti receive a new guilt phase is incorrect. First, the appellate court did not overturn Magill's conviction, but rather remanded the case for a new penalty phase. Second, *Magill* was tried by the chief of the public defender's office, who decided on the first day of jury selection that he would try the case. Prior to his decision to try the case, the chief of the public defender's office knew only what he had been told about the case. In contrast, Puiatti's counsel were well-apprised of the facts of the case before the start of Puiatti's trial. Counsel's actions in *Magill* were egregious, and yet the appellate court did not disturb the guilty verdict. Certainly, Puiatti has not shown that his counsel's actions with respect to *mens rea* arguments amounted to ineffective assistance of counsel.

### D. Change of Venue

Puiatti alleges that his counsel's failure to move for a change of venue either before or after voir dire constitutes ineffective assistance of counsel. Puiatti argues that even if Eble did not know that he should move for a change of venue prior to the start of voir dire, he should have

known after hearing the responses of the prospective jurors. Puiatti claims that the extensive

publicity surrounding the crimes "reached a substantial number of the prospective jurors,

actually prejudicing them against Puiatti's innocence." Amended Petition at 33. Puiatti argues

that in addition to the pre-trial publicity, publicity during voir dire and the subsequent trial

further prejudiced the jury against him.

To prove ineffective assistance of counsel for failure to move for a change of venue, a

petitioner must show, "at a minimum, [that] there is a reasonable probability that the trial court

would have, or at least should have, granted a motion for change of venue if [petitioner's]

counsel had presented such a motion to the court." *Chandler v. McDonough*, 471 F.3d 1360,

1362 (11th Cir. 2006) (citation omitted).

The record in this case reflects that 29 of the 53 venire members had knowledge of the

case, and two of the seated jurors had been exposed to pretrial publicity. However, a juror's

knowledge of an incident is not sufficient support to succeed on a motion for a change of venue:

> Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a
> change of venue. The test for determining a change of venue is whether the general state
> of mind of the inhabitants of a community is so infected by knowledge of the incident
> and accompanying prejudice, bias, and preconceived opinions that jurors could not
> possibly put these matters out of their minds and try the case solely upon the evidence
> presented in the courtroom.

*Kelley v. State*, 212 So.2d 27 (Fla. App. 1968). Puiatti has not proven that sufficient bias existed

in the jury pool as to warrant a change of venue, and thus has Puiatti not met the burden imposed

by *Chandler* to prove ineffective assistance of counsel. Puiatti has not shown that his counsel's

failure to move for a change of venue amounted to ineffective assistance of counsel under

*Strickland*.

*E. Voir Dire*

Puiatti argues that he was denied effective assistance of counsel during voir dire. Puiatti alleges that co-counsel Garrett prefaced her questions to potential jurors with the assumption that Puiatti was guilty of first degree murder, effectively admitting Puiatti's guilt and prejudicing potential jurors against him. Further, Puiatti alleges that Garrett repeatedly lost her train of thought and asked confusing and rambling questions of potential jurors. Puiatti points out that the state trial court judge admonished Garrett in his chambers, telling her that "up to now your client has not received effective assistance of counsel." Garrett Aff. ¶ 15, App. 1.

Contrary to Puiatti's assertions, Garrett did not admit Puiatti's guilt during voir dire, but rather asked potential jurors whether they would be able to impose the death penalty if Puiatti <u>were</u> found guilty. For example, Garrett asked one potential juror: "Assuming as a juror that you agreed with the other jurors and reached a verdict as to first-degree murder, would that verdict as to first-degree murder alone mean to you that you should vote for a certain penalty?" R. 1160. Rather than attempting to select jurors who would find Puiatti not guilty during the guilt phase of the trial, Garrett focused on selecting jurors who would be uncomfortable imposing the death penalty. This strategy was likely chosen because of the wealth of evidence tending to prove Puiatti's guilt. Even if Puiatti were correct that Garrett conceded his guilt, that concession would not amount to ineffective assistance of counsel. In *Florida v. Nixon*, 543 U.S. 175, 192 (2004), the United States Supreme Court stated that concession of guilt to first-degree murder does not necessary amount to ineffective assistance of counsel, because "in a capital case, counsel must consider in conjunction both the guilt and penalty-phases in determining how best to proceed." On remand from the United States Supreme Court, the Florida Supreme Court held that "[t]rial counsel was not ineffective for conceding guilt to first-degree murder." *Nixon v. State*, 932 So.2d

28

1009, 1018 (Fla. 2006). Given the large amount of evidence of Puiatti's guilt, it was not unreasonable for Garrett to focus more on the penalty phase of Puiatti's trial than on the guilt phase, hoping to empanel a jury wary of imposing the death penalty. Puiatti has not shown that his counsel's questioning during voir dire amounted to ineffective assistance of counsel under *Strickland.*

### F. Conclusion

Puiatti has not proven ineffective assistance of counsel during the guilt phase of his trial to meet the *Strickland* standard. Many of the alleged defects in counsel's performance during the guilt phase are premised on arguments which would have failed had they been raised.[10] Although Puiatti's attorneys had not previously tried a capital case, they did not perform below an objective standard of reasonableness during Puiatti's trial. Further, Puiatti has failed to prove that the alleged deficient performance by counsel resulted in an unfair or unreliable outcome, or that the outcome would have been different if counsel had performed the way Puiatti now claims counsel should have performed. Ground Two does not warrant relief.

### Ground Four: Ineffective Assistance of Appellate Counsel

Puiatti alleges he was denied effective assistance of appellate counsel when his appellate counsel failed to argue various alleged deficiencies in the guilt phase of Puiatti's trial. Effective assistance of appellate counsel claims are analyzed under the *Strickland* two-prong test. Additionally, "[i]f a legal issue would in all probability have been found to be without merit had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless

---

[10] The record does not reveal whether Puiatti's counsel failed to raise certain arguments during the guilt phase of Puiatti's trial because Puiati's counsel they knew would fail, or because counsel were inexperienced. Regardless, if Puiatti's counsel committed any error, the error was harmless and did not result in prejudice under *Strickland.*

issue will not render appellate counsel's performance ineffective." *Rutherford v. Moore*, 774 So.2d 637, 643 (Fla. 2000) (citation omitted).

## A. Juror Challenges

Puiatti argues that he was denied effective assistance of appellate counsel because his appellate counsel failed to argue that Puiatti's Constitutional rights were violated when the state trial court judge denied numerous juror challenges for cause. Puiatti alleges that he was forced to use peremptory challenges to remove three jurors who should have been excused for cause, effectively reducing the number of peremptory challenges available to him from ten to seven.[11] Specifically, Puiatti challenges the state trial court's refusing to remove jurors Roller, Withers, and Tucker for cause.

### i. Standard of Review for Denying For-Cause Juror Challenges

The state trial court has broad discretion in determining whether to grant or deny a juror challenge for cause, and will not be overturned on appeal absent manifest error. In general, the Florida Supreme Court is highly deferential to the state trial court:

> There is hardly any area of the law in which the trial judge is given more discretion than in ruling on challenges of jurors for cause. Appellate courts consistently recognize that the trial judge who is present in voir dire is in a far superior position to properly evaluate the responses to the questions propounded to the jurors.

*Cook v. State*, 542 So.2d 964, 969 (Fla. 1989). Indeed, a decision not to remove a juror for cause "will not be overturned on appeal absent manifest error." *Overton v. State*, 801 So.2d 877, 889 (Fla. 2001) (citing *Van Poyck v. Singletary*, 715 So.2d 930, 931 (Fla. 1998)).

---

[11] Capital defendants are guaranteed ten peremptory challenges by Florida statute. *See* Fla. R. Crim. P. 3.350(a).

Determining whether manifest error exists is a question of reasonableness: "Juror excusals for cause are normally within the trial court's discretion, and a court's ruling will be sustained unless no reasonable person would agree with the court." *Kokal v. Dugger*, 718 So.2d 138, 142-143 (Fla. 1998).

### i. Juror Roller

Juror Roller told the court she knew the two prosecutors in the case through work, but dealt with them mostly by telephone. Roller told the court that she also knew one of the potential witnesses in the case, Ms. Bass, and several police officers involved in the investigation. Puiatti claims that Juror Roller's relationships with the prosecutors, Ms. Bass, and the police officers involved in the investigation prejudiced her against Puiatti. However, Juror Roller only interacted with the prosecutors and police officers in a professional capacity, and indicated that she did not value their opinions any more or less highly than those of the other individuals involved in the case. When questioned about her ability to impartially weigh the credibility of Ms. Bass as a witness, Roller hesitated, telling the court that her previous knowledge of Ms. Bass could play a role in a determination of credibility. Puiatti moved to have the state trial court excuse Juror Roller for cause, and the court denied the motion. As a result, Puiatti used one of his peremptory challenges to remove Juror Roller.

Puiatti quotes *Singer v. State* and argues that "if there is basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial he should be excused on motion of a party, or by the court on its motion." *Singer v. State*, 109 So.2d 7, 23-24 (1959). While Puiatti is correct that *Singer* found reversible error in the state trial court's denying a

motion to remove a prospective juror for cause, *Singer* is distinguishable from Puiatti's case. In *Singer*, the prospective juror expressed a biased opinion as to the guilt or innocence of the defendant; he admitted to forming an opinion about the case based upon what he had heard and read, and he told the court that he would need to be shown evidence to change that opinion. Essentially, the prospective juror in *Singer* had, in his own mind, shifted the burden of proof to the defendant. In Puiatti's case, however, Juror Roller did not make any statements about the guilt or innocence of Puiatti; she merely admitted to knowing Ms. Bass.

Juror Roller told the state trial court that she would not place any greater emphasis on Ms. Bass's testimony because of their prior relationship, and indicated that she would follow the state trial court's instructions as to witness credibility. R. 1259-60. Roller stated that she would not have any difficulty objectively determining Puiatti's guilt or innocence. R. 1254-55. While prospective jurors' statements relative to their own impartiality are not dispositive of that issue, the statements can quell reasonable doubt as to the impartiality of that juror in the mind of the state trial court judge. The state trial court judge did not abuse his discretion in denying the for-cause challenge to Juror Roller. Therefore, Puiatti's appellate counsel was not ineffective for failing to raise the argument on appeal.

### ii. Juror Withers

During voir dire questioning, Juror Withers was asked whether anything would interfere with his ability to consider the opinions of mental health professionals.[12] Withers responded that he "wouldn't put too much value on what a psychiatrist told [him]." R. 1284. However, Withers

_____

[12] Puiatti also argues that Juror Withers equivocated when asked whether he could be fair, indicating he would be "as fair as [he] could be," and stating: "Well, I think I could follow the instructions the judge gives, yes." R. 1279-80. However, these responses did not reflect uncertainty on the part of Juror Withers, but rather ambiguity in Garrett's questions. Juror Withers repeatedly told Garrett that he had difficulty understanding the meaning of her questions. R. 1280-1282.

told the state trial court that he would objectively follow the judge's instructions, regardless of his personal feelings toward mental health professionals. R. 1282-84. Puiatti moved to excuse Juror Withers for cause, and the state trial court judge denied that motion.

Puiatti's claim as to Juror Withers is cogent only to the penalty phase of Puiatti's trial. Garrett asked Juror Withers about considering mental health experts in mitigation of Puiatti's sentence, not as they related to the guilt phase of Puiatti's trial. Further, no mental health experts testified during the guilt phase of Puiatti's trial.[13] Therefore, if the state trial court judge committed any error in not excusing Juror Withers for cause, the error was harmless. Puiatti's appellate counsel was not ineffective for failing to raise the argument.

### iii. Juror Tucker

Juror Tucker revealed during voir dire that he had heard and read previously about Puiatti's case, and remembered many of the details surrounding Puiatti's arrest. When asked whether he had formed an opinion regarding Puiatti's guilt or innocence, Tucker told the court: "[I]t's hard not forming an opinion of some kind under the circumstances . . . I've been wondering quite a bit about that ever since yesterday." *See* R. 1413-16. Puiatti moved to excuse Tucker for cause, and the state trial court judge denied the motion.

Merely showing that a juror has been exposed to details of an alleged crime is not grounds for removing a juror for cause. *Castro v. State*, 644 So.2d 987, 990 (Fla. 1994) ("The mere fact that jurors were exposed to pretrial publicity is not enough to raise the presumption of unfairness."). To require all jurors to be completely ignorant of the facts of a case would be to set an impossible standard in high-profile cases such as Puiatti's. The dispositive issue is

---

[13] In fact, Puiatti claims in Ground Two that his trial counsel was ineffective for failing to utilize mental health experts to contest *mens rea* during the guilt phase of his trial.

"whether the jurors can lay aside any opinion or impressions and render a verdict based on the evidence presented in court." *Teffeteller v. Dugger*, 734 So.2d 1009, 1020 (Fla. 1999). Juror Tucker was candid with the court in admitting that although he found it difficult to remain unbiased, he nevertheless would do so, and indicated he would have no problem basing a verdict solely on the evidence produced at trial in accordance with the jury instructions. R. 1256. Tucker further told the court that he knew newspaper accounts were often incorrect and biased, and even expressed concern that none of the articles he had read considered Puiatti's possible innocence. R. 1414-15. The state trial court judge did not abuse his discretion in refusing to excuse Juror Tucker for cause. Therefore, Puiatti's appellate counsel was not ineffective for failing to raise the argument on appeal.

### B. Peremptory Challenges

Puiatti alleges he was denied effective assistance of appellate counsel when appellate counsel failed to argue that the state trial court judge erred in denying Puiatti's motion for additional peremptory challenges. Puiatti argues that since he was forced to exercise three peremptory challenges to excuse Jurors Roller, Withers and Tucker, he was entitled to three additional peremptory challenges, and that when the state trial court judge denied his motion for the additional peremptory challenges, members of the jury were seated who had "plainly indicated prejudices against Puiatti." Amended Petition at 94. Since the state trial court did not err in refusing to excuse Jurors Roller, Withers and Tucker for cause, Puiatti was not entitled to additional peremptory challenges. This claim is without merit, and Puiatti's appellate counsel was not ineffective for failing to raise the argument.

*C. Questions During Voir Dire*

Puiatti claims that he was deprived of effective assistance of appellate counsel when appellate counsel failed to argue that the state trial court judge improperly sustained objections related to defense counsel's questioning during voir dire. Specifically, Puiatti argues that his trial counsel should have been allowed to ask questions regarding jurors' views on the death penalty. The prosecution repeatedly objected to counsel's questions regarding the death penalty, and the state trial court judge sustained those objections.[14] Additionally, Puiatti argues that the state trial court judge improperly sustained objections to questions regarding jurors' opinions of mental health experts.

Puiatti first argues that the state trial court improperly sustained an objection to this question: "Do you feel that the death penalty should be the penalty in every murder case?" R. 923-924. While Puiatti is correct that capital defendants have the right to question potential jurors regarding their feelings on the death penalty, *Morgan v. Illinois*, 504 U.S. 719 (1992), the objection to this question is sustainable on subject matter grounds. This question did not inquire as to the prospective juror's application of <u>existing law</u>; rather, it inquired as to a conception of what laws <u>should</u> exist. This kind of question is a normative question. Normative questions on the law are not within the purpose of voir dire, and objections to normative questions are sustainable. *See King v. State*, 390 So.2d 315 (Fla. 1980) (finding that a trial judge was within his discretionary authority in sustaining an objection to a normative question on the law), *overruled on other grounds by Strickland v. State*, 437 So.2d 150 (Fla. 1983).

---

[14] It is worth noting that in Ground Two, Puiatti claims that Garrett was ineffective during voir dire, partly because she "elicited multiple sustained objections from the Prosecution." If the prosecution's objections to voir dire questioning regarding the death penalty were not meritorious, Garrett's eliciting them would not constitute ineffective assistance of counsel.

Next, Puiatti argues that the state trial court improperly sustained an objection to this question: "Do you have any preconceptions about what would be the appropriate penalty for first-degree murder without knowing more than simply a first-degree murder verdict?" R. 1291. The venierperson being question responded: "I don't understand you," prompting the prosecution's objection as to the form, not the content of the question. This objection was sustainable. Even assuming the objection should not have been granted, any resulting error was harmless, as the juror to whom Garrett asked the question was Juror Roller, who was later peremptorily excused.

Puiatti next asserts that he was unable to ascertain a prospective juror's feelings about the death penalty when the state trial court judge sustained an objection to this question: "[D]o you feel that if Puiatti is guilty of first degree murder, that he should automatically get a sentence of electrocution?" R. 1606. The court sustained the objection because the question did not adequately explain the role of jury instructions as to aggravating and mitigating factors. *Id.* Further, Puiatti's counsel later asked this question of the same juror, and received a response: "[S]ome people do feel that an eye-for-an-eye, tooth-for-a-tooth is the philosophy to follow . . . do you feel that that is your philosophy?" R. 1609. Even if the state trial court judge erred in sustaining the objection as to counsel's initial question, Puiatti's counsel was not deprived of the right to ascertain the prospective juror's views on the death penalty.

Puiatti also argues that the state trial court improperly sustained an objection to this question: "Do you think you'd have difficulty excluding your feelings about psychiatrists?" R. 1284. Even if the state trial court judge abused his discretion in sustaining this objection, Puiatti

did not suffer prejudice: Garrett had posed the objected to question to Juror Withers, who was later peremptorily excused for his views on mental health professionals.[15]

Finally, Puiatti argues that the state trial court judge improperly sustained an objection to a question regarding bias against testimony from family members offered in mitigation of a possible death sentence. As Respondent correctly points out, the prospective juror to whom the question was posed, Juror Heikkinen, was later excused for cause.

Any argument appellate counsel could have made regarding objections during voir dire would not have been meritorious. The objections Puiatti complains of were properly sustained. The record shows that Puiatti was not deprived of his right to question the venire as to their views on the death penalty. Puiatti's appellate counsel was not ineffective for failing to raise this argument.

### D. Involuntariness of Confessions

Puiatti argues that he was denied effective assistance of appellate counsel when appellate counsel failed to raise on appeal that Puiatti's confessions were involuntary. Puiatti alleges that neither the confession he gave in New Jersey on August 21, 1982, nor the joint confession he gave in Florida on August 24, 1982 was voluntary. Puiatti further alleges that he made the confessions without knowing or understanding his *Miranda* rights. Puiatti's appellate counsel challenged the admission of the confessions on Fourth Amendment grounds. Puiatti claims that his appellate counsel was ineffective for failing to argue against the admission of the confessions

---

[15] Puiatti objects in Ground Four(a) to the state trial court's refusing to excuse Juror Withers for cause, claiming his views toward mental health professionals biased him against Puiatti. Puiatti cannot simultaneously claim that (1) Juror Withers should have been excused for cause because of his views on mental health professionals, and (2) that his trial counsel was unable to ascertain Juror Withers's views on mental health professionals.

on Fifth, Sixth, and Fourteenth Amendment grounds. However, this claim would not have been successful regardless of the grounds on which it was raised.

### i. Sixth Amendment Right to Counsel

Puiatti claims his appellate counsel should have contested the voluntariness of his confession on Sixth Amendment grounds by alleging that Puiatti was deprived of the right to counsel during his interrogation in New Jersey, rendering his confession inadmissible in Florida. Puiatti alleges that he filled out a form while in custody in New Jersey requesting a lawyer, and that his request was ignored by the New Jersey police. Puiatti did not raise this claim in his Florida state petition for a writ of habeas corpus. The only claims Puiatti raised in his state habeas corpus petition were the involuntariness of his individual and joint confessions, and the alleged delay in his first appearance in New Jersey. Since the Sixth Amendment ineffective assistance of appellate counsel claim was not fairly presented in state court, it is not exhausted, and is procedurally defaulted.

Further, there is ample evidence in the record to suggest that Puiatti was well-informed of his right to counsel, and that he declined to exercise that right. In fact, in the suppression hearing in the Florida state trial court, Puiatti told the state trial court that he never asked the detectives in New Jersey to see a lawyer. R. 716, 719-20. Even after being returned to Florida, Puiatti declined to see the public defender who was waiting at the police station for him. R. 689. Even if Puiatti's claim were not procedurally defaulted, given the contrary evidence in the record, Puiatti's appellate counsel likely made a strategic decision not to raise the argument. Faced with the Florida Supreme Court's page limit[16], appellate counsel likely focused on the arguments that

---

[16] Initial and answer appellate briefs may not exceed fifty pages in Florida. *Fla. R. App. P.* 9.210.

were most strongly supported by the record. Since there is ample evidence in the record to contradict the Sixth Amendment claim, Puiatti's appellate counsel was not ineffective in failing to raise this argument. *See Strickland*, 466 U.S. at 689 (holding that courts not find ineffective assistance of counsel when the failure to raise an issue "might be considered sound trial strategy") (citation omitted). Likewise, Puiatti's appellate counsel was not ineffective in failing to raise this argument on Fifth or Fourteenth Amendment grounds.

### ii. The New Jersey Confession

Puiatti next argues that the police officers in New Jersey who arrested and detained him violated standard practice by not allowing Puiatti to make a phone call. Puiatti also objects to the fact that he was not taken in front of a judge until several days after his arrest. Puiatti asserts that these violations rendered his New Jersey confession inadmissible in Florida, and appellate counsel failed to effectively argue that inadmissibility. In *Middleton v. State*, 465 So.2d 1218, 1228 (Fla. 1985), the Florida Supreme Court heard a claim very similar to Puiatti's:

> We will not consider the correctness of the procedure used by the New York authorities nor of the effect that a procedural violation would have on admissibility in Florida. At the original trial the court determined that the confession itself was voluntary and admissible. For appellate counsel to decide not to raise the ground of inadmissibility now identified was not a serious defect of performance.

Under *Middleton*, any procedural violations that may have occurred in New Jersey do not bear on the admissibility of the New Jersey confession in Florida because the Florida state trial court found the confession was voluntary and admissible. Therefore, appellate counsel was not ineffective in failing to raise these claims.

### iii. The Joint Confession

Finally, Puiatti argues he made the joint confession after a 20-hour trip from New Jersey to Florida, and a subsequent three-to-four-hour interrogation by three detectives. Puiatti alleges that he was sleep-deprived and tired to the point that his joint confession in Florida was involuntary. However, Puiatti testified at the suppression hearing in the state trial court that he felt "[a] little bit tired, but otherwise okay" after he returned to Florida.[17]  R. 731. Puiatti has not presented evidence to show that he asked to stop the questioning at any time after arriving in Florida. In the absence of such evidence, there is nothing to suggest that circumstances surrounding Puiatti's joint confession rose to a level rendering the confession involuntary. Therefore, Puiatti's appellate counsel was not ineffective for failing to make this argument.

### E. Felony Murder

Puiatti argues that he was denied effective assistance of appellate counsel when appellate counsel failed to argue that a felony murder jury instruction was improper. Felony murder, unlike premeditated murder, does not require proof of intent. Puiatti asserts that felony murder must be formally charged by the prosecution to be considered by the jury. The prosecution did not formally charge Puiatti with felony murder in the indictment, but rather requested that a jury instruction on felony murder be included at the close of the trial. Puiatti claims that his primary defense during the guilt phase of his trial – his lack of *mens rea* to commit premeditated murder - was undermined by the state trial court's decision to allow the jury to consider felony murder.

To raise an argument on appeal, that argument must first be presented to the lower court at trial, "and the specific legal argument or ground to be argued on appeal must be part of that

---

[17] Puiatti asserts that because he was transported from New Jersey to Florida over a period of 20 hours, he was awake for a 20-hour period. However, the record does not show that Puiatti was awake for the entire trip.

presentation." *Archer v. State*, 613 So.2d 446, 448 (Fla. 1993). Puiatti's trial counsel did not

object to the felony murder jury instruction on the ground that it should have been formally

charged by the prosecution and included in the indictment, but rather only complained that there

was insufficient evidence of an underlying felony to support felony murder. Therefore, counsel

did not preserve an objection on the issue that Puiatti now argues. Absent a properly preserved

objection, Puiatti's appellate counsel would have been barred from raising the argument, and had

no obligation to raise it. *Wright v. State*, 857 So.2d 861, 875 (Fla. 2003) ("Appellate counsel has

no obligation to raise issues on appeal that were not preserved for review.") Therefore, Puiatti's

appellate counsel was not ineffective in failing to raise the issue on appeal.

Even if Puiatti's trial counsel had properly objected to the jury instruction, an argument

against it would be meritless on appeal because "an indictment charging premeditated murder

would permit the state to proceed on either the theory of premeditated murder or felony murder."

*Bush v. State*, 461 So.2d 936 (Fla. 1984) (citing *Knight v. State*, 338 So.2d 201 (Fla. 1976)).

Contrary to Puiatti's assertions, *Bush* does not require the State to mention specifically the theory

of felony murder during trial. The State was entitled to a jury instruction on felony murder given

the indictment charging premeditated murder. Therefore, even if Puiatti's trial counsel had

properly objected to the jury instruction at trial and preserved the claim for appeal, Puiatti's

appellate counsel was not ineffective for failing to make this argument.

### F. Conclusion

Puiatti alleges that his appellate counsel should have made many arguments that are

without merit. When crafting appellate arguments, it is important to separate the claims that will

likely be meritorious from those that will not. Indeed, the "process of winnowing out weaker

arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (citation omitted). Puiatti's appellate counsel chose not to raise certain arguments on appeal because he would be unlikely to prevail on those arguments. By focusing on the most meritorious claims, Puiatti's appellate counsel directed the Florida Supreme Court's attention to the grounds on which Puiatti had the greatest chance of having his conviction overturned. Puiatti's appellate counsel did not perform below objectively reasonable standards, and was not ineffective. Ground Four does not warrant relief.

### Ground Seven: Inflammatory Prosecutorial Arguments

Puiatti alleges that the prosecutor made improper arguments during the guilt and penalty phases of his trial, and that the state trial court judge misstated the law in the jury instructions. Puiatti's arguments with respect to the penalty phase of his trial are subsumed by Ground One, as stated above under the Penalty Phase section of this order, and are moot. As to the guilt phase, Puiatti contends that the prosecutor used a prohibited golden-rule argument when he asked the jurors to place themselves in the shoes of the victim. *See Bertolotti v. State*, 476 So.2d 130, 133-34 (Fla. 1985) (holding that golden-rule arguments have long been prohibited in Florida). Puiatti also asserts that the prosecutor used inflammatory language to describe the defendants throughout the trial, and specifically made an inflammatory analogy by comparing Puiatti and Glock to hungry wolves in his closing argument. Finally, Puiatti alleges that the judge misstated the law in his jury instructions, suggesting that the jurors could presume premeditation. Puiatti argues that his trial counsel objected to each of these instances of alleged prosecutorial misconduct, and the state trial court erred in overruling his objections. Further, Puiatti

42

repeatedly moved for a mistrial on grounds of prosecutorial misconduct, and alleges that the state trial court erred in denying those motions.

*i. Golden Rule Argument*

Puiatti is correct that golden-rule arguments are prohibited in Florida. *See Bertolotti*, 547 So.2d at 133-134. A golden-rule argument is "[a] jury argument in which a lawyer asks the jurors to reach a verdict by imagining themselves or someone they care about in the place of the injured plaintiff or crime victim." BLACK'S LAW DICTIONARY 700 (7th ed. 1999). Puiatti points to the prosecutor's use of the phrase "any woman's nightmare" to describe what happened to Sharilyn Ritchie as proof that the prosecutor asked the female members of the jury (of which there were five) to put themselves in the victim's shoes. R. 1727. Generally, golden-rule arguments either ask jurors to place themselves in the position of the victim, *Peterson v. State*, 376 So.2d 1230 (Fla. 4th DCA 1979), or ask jurors how they would feel if they were the victims of the alleged crime. *Lucas v. State*, 335 So.2d 566 (Fla. 4th DCA 1979). Merely using the phrase "any woman's nightmare" does not invite the jury to place themselves in the victim's shoes, or consider how they would feel if they were victims of Puiatti's alleged crimes. The statement made by Puiatti's prosecutor was not a golden-rule argument. Indeed, it is difficult to dispute that the alleged crimes would not constitute a nightmare for anyone. The trial court did not err in denying Puiatti's motion for a mistrial and overruling his objections to the alleged golden-rule argument, and no relief is warranted.[18]

---

[18] It is worth noting that the Florida Supreme Court found on direct appeal that Puiatti's claims involving prosecutorial misconduct during the guilt phase of his trial "require[d] no discussion." *Puiatti v. State*, 495 So.2d 128, 130 (Fla. 1986).

*ii. Inflammatory Language and Comparison*

Puiatti alleges that the prosecutor made improper inflammatory remarks to the jury throughout the guilt phase of the trial. Specifically, Puiatti objects to this analogy during closing argument: "It's like the hungry wolves circling around a rabbit some place who has no idea what's about to happen, and when the time is right they pounce upon their prey." R. 2122. Puiatti claims that the judge's failure to grant Puiatti's motion for a mistrial is reversible error.

Puiatti asserts that the United States Supreme Court has condemned prosecutorial remarks similar to those of the prosecutor at Puiatti's trial: "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." *Darden v. Wainwright*, 477 U.S. 168, 191 (citing ABA Standards for Criminal Justice 3-5.8(c) (2d ed. 1980)). While inflammatory prosecutorial arguments are generally not looked upon favorably by courts, the threshold for establishing reversible error is high: in the *Darden* case, the court described the prosecutor's improper comments as "a relentless and single-minded attempt to inflame the jury."[19]

The comments of the prosecutor in Puiatti's case did not rise to the level of those of the prosecutor in *Darden*. Indeed, similar petitions for habeas corpus in which prosecutorial comments were even more inflammatory have been denied. *See Cronnon v. State of Ala.*, 587 F.2d 246 (5th Cir. 1978) (holding that prosecutorial comments calling the defendant a "fiendish ghoul" who wanted to see the "stark terror on the little girl's face" were strong, but warranted by the evidence). The prosecutorial comments during Puiatti's case certainly were strong, but were

---

[19] The prosecutor in *Darden* told the jury: "[I wish] that I could see [Darden] sitting here with no face, blown away by a shotgun."

not unwarranted by the evidence. The state trial court committed no reversible error in denying

motions for a mistrial on grounds of prosecutorial misconduct for inflammatory language.

### iii. Misstatement of Law

Puiatti alleges that the state trial court judge misstated the law in the jury instructions,

leading the jury to believe they could presume premeditation. Specifically, Puiatti objects to this

statement:

> The question of premeditation is a question of fact to be determined by you from the
> evidence. It will be sufficient proof of premeditation if the circumstances of the killing
> and the conduct of the accused convince you beyond a reasonable doubt of the existence
> of premeditation at the time of the killing.

R. 2154. Puiatti argues that the this portion of the jury instructions constituted reversible error.

This claim is without merit. If one examines the instruction in context, it is clear that the

jury was not misled as to premeditation:

> Before you can find either defendant guilty of first degree premeditated murder, the State
> must prove the following three elements beyond a reasonable doubt: First is that Sharilyn
> Ritchie is dead; the second is that the death was caused by the criminal act or agency of
> Robert Glock or Carl Puiatti; and third is that there was a premeditated killing of Sharilyn
> Ritchie.
>
> A killing with premeditation is killing after consciously deciding to do so. The decision
> must be present in the mind at the time of the killing. The law does not fix the exact
> period of time that must pass between the formation of the premeditated intent to kill and
> the killing. The period of time must be long enough to allow reflection by the defendant,
> and the premeditated intent to kill must be formed before the killing.
>
> The question of premeditation is a question of fact to be determined by you from the
> evidence. It will be sufficient proof of premeditation if the circumstances of the killing
> and the conduct of the accused convince you beyond a reasonable doubt of the existence
> of premeditation at the time of the killing.

R. 2153-55. Finally, even assuming the jury instruction did mislead the jury, any resulting error was harmless. The overwhelming weight of the evidence supported Puiatti's guilt, including two detailed confessions: one individual confession, and one joint confession. Any harm allegedly caused by the jury instructions does not rise to the level of reversible error.

*iv. Conclusion*

The portion of Ground Seven that pertains to the guilt phase of Puiatti's trial does not warrant relief.

## Ground Eight: The Admission of Glock's Confession

Puiatti alleges that the failure to sever his trial, and the admission of Glock's confession during the guilt phase of the trial violated his Constitutional rights under *Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* holds that the admission of a co-defendant's confession deprives a defendant of his rights under the confrontation clause of the Sixth Amendment. Puiatti argues that the admission of Glock's confession impermissibly incriminated Puiatti because it indicated that it was Puiatti's idea to kill Sharilyn Ritchie.

*Bruton* does not control this case, because the confessions given by Puiatti and Glock were substantially consistent with one another, and generally tended to support each other. Puiatti and Glock gave <u>interlocking</u> confessions. *See Parker v. Randolph*, 442 U.S. 62 (1979); *United States v. Kroesser*, 731 F.2d 1509, 1518 (11th Cir. 1984); *Brownlee v. State*, 478 So.2d 467 (Fla. 4th DCA 1985) (establishing that interlocking confessions need not be identical, but need only be consistent with respect to the major elements of the crime or crimes involved). *Bruton* does not require a reversal of a defendant's conviction when the defendant himself has

confessed, and his confession "'interlocks' with and supports the confession of his codefendant." *Parker*, 442 U.S. at 64.

The differences between Puiatti's and Glock's confessions did not bear on Puiatti's guilt or innocence.[20] If the differences were significant at all, they were only significant during the penalty phase, when Puiatti presented his mitigating evidence. Given that no significant differences between Puiatti's and Glock's confessions existed as they pertained to the guilt phase of the trial, the confessions were interlocking. Therefore, the state trial court's decision not to sever Puiatti's trial from Glock's did not violate *Bruton*. Ground Eight does not warrant relief.

## CONCLUSION

For all the above-stated reasons, the Court:

(1) **GRANTS** Petitioner's claim that he was denied his Constitutional right to an individualized determination of sentence in a capital case, and finds as moot all other claims relating to the penalty phase of Petitioner's trial. Petitioner's sentence of death is **VACATED**.

(2) **DENIES** all claims in the Petition as to the guilt phase.

(3) **ORDERS** Respondent to conduct a new penalty phase for Petitioner to commence within six months from the date of this Order, or if an appeal is taken from this Order, within six months of the date this Order becomes final.

The clerk is directed to enter judgment for Petitioner as to the penalty phase portion of this Order: to enter judgment for the Respondent as to the guilt phase portion of this order; and to close this case.

---

[20] Puiatti argues that the joint confession he and Glock gave in Florida did not resolve the inconsistencies in their individual confessions. Puiatti alleges that Glock never admitted that it was his idea to kill Sharilyn Ritchie. However, Glock did not dispute Puiatti's claim that Glock instigated the killing, effectively acknowledging the truth of Puiatti's statement. Regardless, even if Puiatti is correct that inconsistencies remained in the joint confession, they did not affect the determination of Puiatti's guilt or innocence.

## *CERTIFICATE OF APPEALABILITY*

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability as to the guilt phase portion of this Order, and that Respondent is not entitled to a certificate of appealability as to the penalty phase portion of this Order.

ORDERED at Tampa, Florida, on _AUGUST 14th_, 2009.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to:

All parties and counsels of record.